## THE NO. I OF NEW YORK.

## THE JAMES WATT.

## McNAMARA v. WESTERVELT et al.

### No. 12116.

District Court, E. D. New York.

Feb. 4, 1932.

Thomas A. McDonald, of New York City (Franklin M. Depew, of New York City, of counsel), for libelant.

Alexander, Ash & Jones, of New York City, for claimant.

Arthur J. W. Hilly, Corp. Counsel, of New York City (William J. Leonard, of Brooklyn, N. Y., and Lester W. Easton, of New York City, of counsel), for City of New York.

BYERS, District Judge.

This libel by the owner of coal boat No. 1 of New York was filed against the tug James Watt, for causing the former to strike the easterly abutment of the bridge which carries Broadway, Manhattan, across the Harlem river. As the result, a hole was stove in the starboard side of the barge, causing the damage in question.

The owner of the tug has impleaded the city of New York, asserting that its faulty operation of the draw of the bridge caused the tug to lose control of its tow.

The circumstances preceding the injury seem to be without precedent in the reported cases having to do with the relations be-

tween vessels navigating through drawbridges, and the bridges.

On August 22, 1930, the tug, having one barge alongside to starboard, picked up the libelant's barge at Kenlon's dock, nearly 500 feet easterly of the bridge, on the Manhattan shore. The barge was apparently facing away from the bridge, and inside another vessel, and so the tug approached the dock or bulkhead, head-on, in such a way that the No. 1 of New York was pulled astern, and then made fast alongside to starboard of the one barge already in the tow. The tug then started from Kenlon's dock, heading away from the bridge, but rounding to, to straighten away for the bridge; this required that she accomplish a complete turn to port, so as to be in a position to pass through the draw. The stream is more than 300 feet wide between bulkheads, at the bridge; but the center is occupied by the abutment nearly or about 100 feet wide, with the result that the passage on either side of the abutment is 103 feet wide.

The tow had an over-all width of nearly 90 feet, made up as it was, so that the clearance would be about 6½ feet on both starboard and port hands, if the tow were able to keep in the center of the passage. The ebb tide was running toward the bridge, at 2.4 miles per hour.

Starting the maneuver at about 11:40 a. m., there being no other natural conditions prevailing than as stated, the tug blew three whistle blasts, requesting that the bridge open. Promptly the bridge blew an answer of two blasts, acknowledging the request, known as the "stand-back" signal. Street traffic was cleared on the bridge, and at about 11:42 o'clock the bridge blew a three-whistle signal to the tow to come ahead.

The barges were light, and the tug had difficulty in rounding to, and had to back once or twice to complete her turn, which took time. At 11:45, fire apparatus, responding to an alarm, reached the bridge from the Manhattan side, and this was known to every one concerned.

The bridge tender observed the delay on the part of the tow, and informed the bridge engineer that there was little or no progress being made, and suggested closing the draw, to admit of the passage of the apparatus. The records show that this operation, which takes about one minute, was completed at 11:49 a. m. The bridge blew a stand-back signal of two blasts, repeated four times.

The tug blew an alarm of four or five blasts as a protest, for the reason as stated by the tug captain, that he couldn't control his barges, being broadside to the tide.

The evidence is conflicting only as to the distance of the tow from the bridge when the closing signal was blown. The tug's witnesses say that the libelant's barge was about 75 feet from the abutment, and the city's witnesses say that the tow was still down by Kenlon's, or at least 350 to 400 feet from the bridge.

When it is reflected that the tow was drilling back and forth in a tide-way running toward the bridge at 2.4 miles an hour, for at least five minutes, it will be seen that the tow must have been nearer the bridge, at the time of closing, than any of the city's witnesses recall. The only backing done by the tug was incident to making the turn, and the injury done to the barge was due to the contact between her starboard side and the abutment, so that clearly the turn had been about completed when the tow bore down upon the bridge in spite of the tug's efforts to hold off.

It should be observed that, upon an ebb tide, tows customarily use the Manhattan, or port, passage proceeding toward the Hudson river, which was the course chosen upon this occasion.

After the bridge was closed, the tow hung up on the abutment, by means of a line made fast by the tug's pilot around a stringer on the abutment; then the bridge opened a second time, and the tow passed through as intended.

Fault is attributed to the tug, by the city, in that the make-up was improper, i. e., the tug should have been between the barges. Perhaps, if this had been done, the tow could have backed in a straighter course, but there is no preponderance of evidence so to establish. The tug captain testified that, by having both barges on his starboard side, he could easily estimate his own clearance on his port side in going through the draw. This is clearly so. Further, that such a make-up is conventional in these waters, with the tide under foot. It cannot be said that the contrary was shown.

Again, there would be the same power available in either case.

It is urged that the passage should not have been attempted by the tug at all, with two barges alongside, because of the comparatively small clearance presented. The answer to this is that the damage was not caused by the failure of the tow to negotiate the passage, but because entrance was barred by act of those in charge of the bridge.

Whether the tow could have passed through the Manhattan side of the draw, without incident, had the bridge remained open, is entirely a matter of speculation, and therefore cannot form the basis of a conclusion.

The sole subject for determination is the measure of responsibility attributable to the city of New York as the result of the rescission of the 3-whistle signal to proceed, given to the tow. It is thought that this was so grave an assumption of responsibility, that any result which was the natural and necessary consequence of it must be visited upon the respondent impleaded.

Those in charge of the bridge necessarily assumed to decide that the tow could be so maneuvered that no injury would result from the recall of the signal in obedience to which the tow was acting; this called for practical knowledge of what this tow could do under the conditions existing, and, if the decision proved to be erroneous, as was the fact, no amount of good faith can serve to avoid the consequences of the exercise of mistaken judgment.

By "good faith" is meant the belief of the bridge tender and the engineer, that the fire apparatus must be accommodated, at the expense of a slow moving tow.

Perhaps even the consequences were weighed, and the course chosen was deemed to be the less likely of the two to come to serious result, but that does not change the fact that the invitation to proceed, duly given to the claimant's tug, was recalled, and the hazard thereby assumed must now be reckoned with by the city.

Donovan v. New York Central R. Co. (D. C.) 16 F.(2d) 611, decided in the Southern District September 10, 1926, cited by the respondent, is to the effect that the Spuyten Duyvil Bridge was never opened at all, so that no element of recall of a signal to proceed was involved in that case; nor in any other which has been cited in any brief.

For the reasons stated, the libelant is entitled to a decree against the respondent city of New York, with costs; and the libel against the tug will be dismissed for lack of proof of negligence, but without costs.

Settle decree on notice.

If findings are desired because the foregoing is insufficient to comply with Admiralty Rule 46½ (28 USCA § 723), the same should contain appropriate recitals as to incorporation and ownership, and should be settled on notice.